In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-2919

TRACY L. CASKEY,

*Plaintiff-Appellant,*

*v.*

COLGATE-PALMOLIVE COMPANY and
HILL'S PET NUTRITION, INCORPORATED,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 04 C 1239—**David F. Hamilton**, *Chief Judge.*

———————

ARGUED OCTOBER 29, 2007—DECIDED JULY 24, 2008

———————

Before BAUER, RIPPLE and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* After being disciplined and ultimately terminated, Tracy Caskey sued her former employer and its parent company. Caskey alleged that the defendants (1) interfered with her right to medical leave, in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.;* (2) discriminated against her because of her sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.;* and (3) retaliated against her for exercising her

rights under the FMLA, Title VII, and Indiana law. The district court granted summary judgment for the defendants, finding that Caskey's discipline was lawful and that her termination resulted from three unexcused absences from work. Caskey now appeals, and for the reasons stated below, we affirm.

## I. BACKGROUND

Hill's Pet Nutrition, Inc. ("Hill's") produces pet food, and Colgate-Palmolive Co. ("Colgate") is the corporate parent of Hill's. Caskey began working as a technician at the Richmond, Indiana plant of Hill's in 1995. One of her primary duties involved operating an extruder, a piece of heavy machinery that, at the Hill's plant, pushed unprocessed dog food through a grinder and then sliced the food into smaller pieces known as "kibbles." Caskey was terminated after a series of incidents in 2003, including two extruder-related accidents and a series of unexcused absences.

At the plant employee work performance issues were addressed through the Individual Improvement Process ("IIP") which included a multi-tiered discipline system: (1) formal coaching; (2) performance agreement; (3) decision-making leave ("DML"); and (4) "deselection" or termination. Hill's employees who received an absenteeism rate in excess of 2.12% in one calendar year were subject to discipline. In addition, Hill's provides paid leave for illness for its employees under the FMLA. Because of this and other paid time-off programs, employees do not have "sick days." If an employee is absent, and the absence does not qualify as Family Medical Leave ("FML") or another form of protected leave, the absence is recorded as an unexcused absence.

Caskey requested and received FML several times during her employment with Hill's, including from June 27 to September 13, 2000, from April 5 to 15, 2002, from December 13 to to 15, 2002, and from April 24 to May 12, 2003. According to Hill's, Caskey also accrued a series of unexcused absences that did not qualify as FML. As a result of the unqualified absences, Hill's placed Caskey in the formal coaching stage of the IIP in November 2001. On February 27, 2003, Caskey progressed into the performance agreement stage for having an absenteeism rate above 3% in the calendar year.

Caskey advanced further in the IIP the following month. On February 21, 2003, Caskey slipped and fell while operating the extruder. She injured her wrist in the accident, and the injury was treated as a worker's compensation injury. Hill's claimed that Caskey had behaved unsafely; an investigatory team reported that the incident had occurred because Caskey was standing on the "at risk" side of the extruder. Caskey claimed that the standard operating procedure for the extruder at the time of her injury did not include an "at risk" side of the extruder, and that she fell because the floor of the plant was slippery and littered with product. Caskey did not return to work for her next two scheduled shifts on February 22 and 23. A few weeks later, during Caskey's shift, over 50,000 pounds of reject product were produced on the plant line producing kibble—apparently bits of kibble were inappropriately sized—and 20,000 pounds of the defective kibble were bagged in the packaging area before being discovered. Caskey's responsibilities included quality control checks on the plant line that produced the defective product. Based on these two incidents, on March 12, 2003, Hill's placed Caskey on the DML stage

of the disciplinary process, the final stage before termination.

While in the DML stage, a Hill's employee must sign a letter of recommitment and have "no absences and use no emergency vacation time for the duration of the agreement." In April 2003, Caskey violated the terms of her letter of recommitment by requesting vacation time on less than the required forty-eight hours' notice. After an internal discussion, Hill's decided not to terminate Caskey at that point. Later in the month, Caskey saw her family doctor for depression-related symptoms, including "distress, shaking, and heart racing," and the physician recommended that Caskey take time off from work. She requested and received FML from April 24 to May 12, 2003. The treating physician then released Caskey to work as of May 12, and did not authorize additional leave or impose further work restrictions beyond that date.

After returning from FML on May 12, Caskey took a birthday holiday on May 16, and took vacation on May 17 and 18. On May 20, she saw an employment assistance counselor regarding her depression. The counselor, like her treating physician, did not impose any work restrictions on Caskey. The following day, Caskey called a teammate at the Hill's plant and said she was "sick" and was going to miss work for the following two days. She then failed to report to work on May 21, 22, and 27. Caskey did not receive any medical treatment for these absences, and her next visit to a physician occurred in August 2003 for an unrelated condition. On May 29, Hill's sent Caskey a letter stating that she had "self-terminated" by not reporting to work on those three days.

Caskey filed a charge with the EEOC on July 10, 2003 and filed her complaint against Hill's and Colgate on July 28,

2004. On June 9, 2006, the district court granted summary judgment to both Hill's and Colgate on all of Caskey's claims. This timely appeal followed.

## II. DISCUSSION

We review a district court's grant of summary judgment *de novo*. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). We view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Darst*, 512 F.3d at 907.

Before addressing Caskey's specific claims, we briefly glance at the district court's finding that Colgate did not qualify as an "employer" under the FMLA or Title VII and therefore was entitled to summary judgment *in toto*. Colgate was Hill's corporate parent, and Caskey presents no evidence to suggest that Colgate supervised Caskey's work or was the decision-maker regarding Caskey's discipline and termination. We have previously held in almost identical circumstances that the proper employer-defendant would be Hill's, and not Colgate. *See Isaacs v. Hill's Pet Nutrition, Inc. and Colgate-Palmolive Co.*, 485 F.3d 383, 385 (7th Cir. 2007) (citing *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed. 43 (1998)) ("Colgate was not [the plaintiff]'s employer, and she offers no reason why an investor should be liable for Hill's acts. . . . We need not mention Colgate again.") (internal citation omitted). Caskey's most viable argument on appeal regarding Colgate's involvement—that Colgate promul-

gated the policies that directly led to Caskey's termination—is foreclosed by *Bright v. Hill's Pet Nutrition, Inc. and Colgate-Palmolive Co.*, 510 F.3d 766, 771 (7th Cir. 2007). As in those cases, we need not mention Colgate again.

### A. FMLA Interference

We begin with Caskey's FMLA interference claim. The FMLA entitles eligible employees up to twelve weeks of unpaid leave for, among other things, a "serious health condition" that makes an employee unable to perform the functions of his or her position. 29 U.S.C. § 2612(a)(1)(D); *Darst*, 512 F.3d at 908. The FMLA makes it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided by [the Act]." 29 U.S.C. § 2615(a)(1); *Darst*, 512 F.3d at 908.

Caskey claimed that Hill's interfered with her attempt to claim FMLA for the absences on May 21, 22, and 27 of 2003. To prevail on her FMLA interference claim, Caskey must establish: (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled. *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006). The district court found that Caskey failed to establish the third element, because she could not show that she had a serious health condition, and the fourth element, because she did not provide sufficient notice of her intent to take leave.

An employee is entitled to leave under the FMLA if (1) she is afflicted with a "serious health condition," and (2) that condition renders her unable to perform the

functions of her job. 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

Caskey did not present sufficient evidence to show that the string of absences starting on May 21 was the result of a serious health condition. She argues that during this time period she suffered from anxiety, depression, and various other minor ailments, but does not adequately apply these afflictions to the legal standard. At no point in late May did Caskey receive inpatient treatment in any medical facility, so the question becomes whether her condition qualified as "continuing treatment by a health care provider." The FMLA regulations define "continuing treatment by a health care provider" as including, in relevant part, (1) a period of incapacity of more than three consecutive calendar days that also involves either treatment two or more times by a health care provider or a regimen of continuing treatment; or (2) any period of incapacity due to a chronic serious health condition, which requires periodic treatment by a health care provider. 29 C.F.R. § 825.114(a)(2)(I), (iii).

These definitions do not apply to Caskey. Though she had previously received treatment for depression and anxiety, she offered no evidence of incapacity relating to the post-May 20 absences, and she did not receive either treatment two or more times by a health care provider or a "regimen of continuing treatment." She therefore was not receiving "continuing treatment by a health care provider" under § 825.114(a)(2)(I). Caskey argues that the fact that she qualified for FML during April 24-

May 12 means that her condition continued into late May, perhaps suggesting that she suffered a "chronic serious health condition" under § 825.114(a)(2)(iii). Nothing about her FML during April 24-May 12 suggests that Caskey suffered from a chronic condition that continued after May 12 and required periodic visits to a health care provider. Her treating physician specifically stated that Caskey had no work restrictions after May 12. She did not see the physician again until August and then for an unrelated ailment. Caskey had an obligation to show a serious health condition, and her general testimony that her condition was serious is insufficient to raise a genuine issue of material fact on this issue. *Haefling v. United Parcel Service, Inc.*, 169 F.3d 494, 499 (7th Cir. 1999) ("Whether an illness or injury constitutes a 'serious health condition' under the FMLA is a legal question that an employee may not sidestep in the context of summary judgment merely by alleging [her] condition to be so.") Because Caskey neither received continuing treatment by a health care provider nor suffered a chronic condition, her various afflictions do not amount to a serious health condition, and therefore she had no right to FML on May 21, 22, and 27.[1]

---

[1] Because we find that Caskey did not establish the third element of her FMLA interference claim, we need not reach the district court's alternate holding that she did not provide adequate notice. We take note, however, of 29 C.F.R. § 825.300(b), which states that if the FMLA posting requirement in § 825.300(a) is not met, an employer may not take "an adverse action against an employee, including denying FMLA leave, for failing to furnish the employer with advance notice of a need to take FMLA leave." We have not had occasion to address the
(continued...)

### B. Discrimination Based on Sex

Caskey next claims that Hill's improperly discriminated against her because of her sex by placing her, and not male employees, on the DML stage of the disciplinary process after the defective product incident in March 2003.[2] Under Title VII of the Civil Rights Act of 1964, it is unlawful for employers "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . ." 42 U.S.C. § 2000e-2(a)(1). Caskey presented no direct evidence of discrimination, so we analyze her indirect proof using the familiar burden-shifting method under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Ordinarily under *McDonnell Douglas*, a plaintiff must make a *prima facie* case of gender discrimination by showing: (1) she is a member of the protected class, (2) she met her employer's legitimate expectations, (3) she suffered an

---

[1] (...continued)
extent of this regulation and whether it applies to cases such as Caskey's. We decline to do so today, however, because the issue was not adequately briefed by the parties, and because Caskey could not in any event establish that she had a serious health condition.

[2] The district court addressed several other alleged incidents of discrimination, including (1) placing Caskey on the second-stage IIP on February 27, 2003 following the excessive absentee-ism; (2) the extension of the end-date of her original decision-making leave in May 2003; and (3) her May 2003 termination. The court found all of these incidents lacking legal sufficiency. Because Caskey did not raise these incidents on appeal, we address only Caskey's placement on DML in March 2003.

adverse employment action, and (4) her employer treated similarly situated male employees more favorably. *Peirick v. Indiana University-Purdue Univ. Indianapolis Athletics Dept.*, 510 F.3d 681, 687 (7th Cir. 2007). As the district court correctly pointed out, in claims of discriminatory discipline such as this one, "the second and fourth prongs of *McDonnell Douglas* merge." *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004). Accordingly, the analysis of the employer's expectations falls by the wayside, and a "plaintiff must establish that [s]he received dissimilar—and more harsh—punishment than that received by a similarly situated employee who was outside the protected class." *Id.* A similarly situated employee need not be "identical," but the plaintiff must show that the other employee "dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008); *Crawford v. Ind. Harbor Belt RR. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (holding that a similarly situated employee is one who is "comparable to plaintiff in all *material* respects").

The court below found that Caskey could not establish a *prima facie* case because she could not identify any similarly situated male employee who was treated any differently than she was. We agree. Caskey points to several male employees that either worked on the production line the night of the defective product incident or had run defective product in the past, and notes that none of these employees received any discipline for their actions. These employees differ from Caskey in material respects; the majority held different positions in the plant

with separate responsibilities and supervisors, and the few employees with comparable job descriptions lacked the differentiating circumstances of having excessive unexcused absences or having sustained a work-related injury. Caskey failed to produce evidence of a male employee with a similar job description and past inappropriate conduct that received disparate treatment by Hill's, and Caskey cannot establish a *prima facie* case lacking this evidence.

Even if she had such evidence, she would still have to show that Hill's legitimate and non-discriminatory reason for its action was pretext (i.e., a "lie"). *Perez v. Illinois*, 488 F.3d 773, 776 (7th Cir. 2007). She failed to do so. Hill's stated reasons for placing Caskey on DML—that she committed unsafe behavior and produced defective product—were sufficiently nondiscriminatory. Nothing in the record supports a finding that these reasons were fabrications, Caskey's bald statement that this was a "lie" notwithstanding. Without such evidence, summary judgment is appropriate.

### C. Federal and State Law Retaliation

Finally, Caskey challenges the grant of summary judgment of her FMLA, Title VII, and state law retaliation claims. To address her federal claims first: the FMLA makes it unlawful for an employer to discharge or discriminate against an employee for opposing a practice made lawful by the Act. 29 U.S.C. § 2615(a)(2); *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 977-78 (7th Cir. 2008). Similarly, Title VII protects employees who complain to their employers about sexual harassment from retaliation on that basis. 42 U.S.C. § 2000e-3; *Bernier v. Morningstar*,

*Inc.*, 495 F.3d 369, 375 (7th Cir. 2007). We evaluate FMLA and Title VII retaliation claims in the same manner, assessing the direct or indirect method of proof. *See Burnett*, 472 F.3d at 481 n.5 (7th Cir. 2006) (citing *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 n.3 (7th Cir. 2004)). Under the direct method, Caskey must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007).  Under the indirect method, an employee must establish a *prima facie* case by proving that she (1) engaged in a statutorily protected activity; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Nichols v. Southern Illinois University- Edwardsville*, 510 F.3d 772, 784-85 (7th Cir. 2007). Once the *prima facie* case is established, the burden shifts to the employer to produce a non-discriminatory reason for its action; if the employer meets this burden, the burden shifts back to the employee to demonstrate that the proffered reason is pretextual. *Id*. at 785.

Under the direct method, Caskey satisfies the first two elements. Caskey engaged in activity protected by the FMLA: on various occasions from 2000-2003, Caskey requested and received FML. Caskey also engaged in activity protected by Title VII: Caskey supported the discrimination complaints of her co-worker Carol Isaacs, who filed a charge of sex discrimination with the EEOC in July 2002. She also suffered an adverse employment action, though she has not clearly indicated whether the relevant "action" was the second-stage IIP

in February 2003 or her termination in May 2003. Ultimately, however, it does not matter whether her discipline or her termination qualifies as the adverse action, because she has failed to present enough evidence on the third element—connecting her FML or support of Isaacs with her discipline or termination.

Caskey can rely on two types of evidence in showing that her protected activity motivated Hill's action under the direct method of proof: "direct evidence" or "circumstantial evidence." *Lewis v. School Dist. #70*, 523 F.3d 730, 742 (7th Cir. 2008).[3] Direct evidence is evidence "which (if believed by the trier of fact) will prove the fact in question without reliance upon inference or presumption," which typically involves an admission by the decision maker regarding the retaliatory intent. *Id.* (citation omitted). Circumstantial evidence "allows the trier of fact to *infer* intentional discrimination by the decisionmaker," typically through a longer chain of inferences. *Id.* (citation omitted and emphasis in original). Caskey has presented no direct evidence of a causal connection for either her FMLA or Title VII retaliation claims, and insufficient circumstantial evidence for her FMLA claim. Caskey points to some circumstantial

---

[3] Both parties appear to confuse the direct *method* of proof with direct *evidence* of retaliatory or discriminatory intent. *See Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720 n.3 (7th Cir. 2005) (observing that such confusion is understandable). As we have noted previously, one may proceed under the direct method of proof using either direct or circumstantial evidence. *Id.* We will examine whether Caskey's claims can survive under the direct method of proof using either type of evidence.

evidence for her Title VII retaliation claim by alleging that Hill's had a "pattern of terminating female employees who opposed sex discrimination and sex harassment," noting the termination of Isaacs and two other female employees who supported Isaacs. Caskey suggests that we infer from these other terminations that she was the latest in a string of firings related to the Isaacs incident. But her vague reference to a pattern, without any detail regarding the context of the other terminations, creates too sparse a trail to create circumstantial evidence of a causal connection. Like her FMLA claim, Caskey's Title VII claim must fail under the direct method of proof.

Turning to the indirect method of proof, as with her sex discrimination claim, her FMLA and Title VII retaliation claims cannot survive summary judgment because Caskey has not presented a similarly situated employee that was treated more favorably. Moreover, Caskey did not meet the legitimate expectations of her employer. She had progressed through the disciplinary process to the final stage, she did not follow the explicit agreement under the letter of recommitment to have no absences and use no emergency vacation time, and she did not follow the proper procedures for giving notice of any intended time off. Caskey cannot show that Hill's retaliated against her for exercising her rights under FMLA or Title VII.

Turning finally to her state law wrongful termination claim, Caskey contends that she was fired in retaliation for filing a workers' compensation claim. Though employment in Indiana is generally at-will, Indiana recognizes a cause of action for employees discharged in retaliation for filing a workers' compensation claim. *Hudson*

*v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 785 (7th Cir. 2005) (citing *Frampton v. Cent. Ind. Gas Co.*, 260 Ind. 249, 297 N.E.2d 425 (Ind. 1973)). In order to survive summary judgment on the claim, the employee must establish a causal connection between her termination and the filing of her workers' compensation claim. *Id.* (citing *Goetzke v. Ferro Corp.*, 280 F.3d 766, 774 (7th Cir. 2002)). Caskey fails to make a sufficient causal connection here. She relies heavily on the timing of her discipline—i.e., that she was disciplined shortly after her injury, and terminated shortly after that. This timeline omits several other intervening events, including the series of unexcused absences in late May in violation of the Performance Agreement. And timing evidence alone rarely creates a jury issue on causation. *Hudson*, 412 F.3d at 787. The district court correctly found that the dearth of evidence establishing a causal connection doomed her state law retaliation claim.

## III.  CONCLUSION

For the foregoing reasons, the judgment in favor of Hill's and Colgate is AFFIRMED.